**SO ORDERED.**

**SIGNED this 22nd day of August, 2019.**



_Dale L. Somers_
Dale L. Somers
United States Chief Bankruptcy Judge

Designated for print publication
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**ACI Concrete Placement of**
**Kansas, LLC, _et al._,**

             **Debtors.**

Case No. 17-21770
Chapter 11
Jointly Administered

**Memorandum Opinion, Order, and Judgment**
**Denying Motion for Disgorgement of Professional Fees**

Debtors ACI Concrete Placement of Kansas, LLC, and related entities[1]

filed for bankruptcy relief in September 2017 and operated under the

protection of Chapter 11 until the spring of 2019, when the bank holding

---

[1] ACI Concrete Placement of Lincoln, LLC, case no. 17-21771; ACI Concrete
Placement of Oklahoma, LLC, case no. 17-21772; OKK Equipment, LLC, case no. 17-
21773; and KOK Holdings, LLC, case no. 17-21774.

perfected security interests in substantially all of Debtors' assets declared a default as defined by the cash collateral order. Debtors are now out of business, and the cases may be administratively insolvent. The Fund Creditors[2] hold administrative claims which have not been paid in full. They move to disgorge professional fees paid to Debtors' counsel and to counsel for the Unsecured Creditors Committee so that these funds can be allocated among administrative creditors.[3] The Court denies the motion. The Fund Creditors have not provided authority supporting disgorgement and pro rata distribution to administrative claimants when, as in this Chapter 11 case, the payment of the professional fees sought to be disgorged are the subject of a carve-out in cash collateral orders.[4]

---

[2] Operating Engineers Local No. 101 Pension Fund, Operating Engineers Local No. 101 Health and Welfare Fund, Operating Engineers Local No. 101 Vacation Fund, Operating Engineers Local No. 101 Joint Apprenticeship and Skill Improvement Fund, and International Union of Operating Engineers Local 101.

[3] Doc. 402. The Fund Creditors appear by Nathan A. Kakazu of Blake & Uhlig, P.A. Debtors appear by Bradley D. McCormack of The Sader Law Firm. The Unsecured Creditors Committee appears by Larry G. Ball of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.

[4] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order No. 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2014). The Fund Creditors' motion concerns administration of the estates and is a core proceeding which ths Court may hear and determine as provided in 28 U.S.C. § 157(b)(1). There is no objection to venue or

2

## I.    Background Facts

Debtors filed voluntary petitions under Chapter 11 on September 14, 2017. On October 6, 2017 the Court approved the fee arrangement between Debtors and their counsel.[5] It provided for monthly payment of fees and expenses by the Debtors subject to a 10% holdback, and filing of interim fee applications in accordance with 11 U.S.C. § 331.[6] The Court also approved the employment of counsel by the Unsecured Creditors Committee.[7] That order provided that counsel would be paid on a monthly basis and entitled to interim compensation, subject to the same requirements as Debtors' counsel.

Beginning on October 4, 2017, and continuing through January 31, 2019, the Court entered a series of orders allowing Debtors' use of cash collateral.[8] In the orders, Debtors acknowledged that their principal secured creditor, Equity Bank, had a lien on substantially all, if not all, of Debtors' assets, including all of the cash of Debtors in existence when they filed for relief and all cash acquired by the Debtors after the date of filing. The orders

---

jurisdiction over the parties.

[5] Doc. 63.

[6] All references in the text to Title 11 shall be to the section number only.

[7] Doc. 174.

[8] Docs. 52, 99, 248, 291, 320, 333, 341, and 364.

3

authorized Debtors' use of this cash, which constituted cash collateral within the meaning of § 363(a), in accord with attached budgets. Equity Bank was provided protection for the diminution of the value of its collateral through monthly payments, perfected replacement liens in all the Debtors then owned and after acquired assets, including causes of action pursuant to Chapter 5, and a super-priority administrative expense claim. However, in the event of default, as defined in the cash collateral orders, such replacement liens and superpriority claim were subject to certain expenses, defined as carve-out costs. These carve-out costs are comprised of fees paid to the Clerk of the Court, Debtors' professionals, the United States Trustee, and the Creditor Committee's counsel. On March 19, 2019, Equity Bank filed notice that Debtors were in default, and Equity Bank intended to bar the further use of cash collateral and to enforce its right under prior orders of relief from stay.[9] Debtors are no longer operating and it is undisputed that the estates are administratively insolvent.

As of January 8, 2018, fees of $388,649.67 and expenses of $25,915.70 had been approved for Debtors' counsel.[10] On October 2, 2018, the Court approved the Committee's application for fees of $21,592.90 and expenses of

---

[9] Doc. 376.

[10] Report of Professional Fees Applied For/Awarded.

4

$195.57.[11] Notices of additional fees and expense have been filed, but not yet approved by the Court. There have been no objections to any of the fees and expenses. The fees and expenses of the Debtors' and the Committee's attorneys which the Fund Creditors move to be disgorged are hereafter collectively referred to as Professional Fees.

Likewise, the Fund Creditors have been paid an estimated $1,100,000, in accord with the monthly budgets.[12] In addition, the Fund Creditors have filed two motions for allowance of administrative expenses. The first, requested payment of $100,654.22,[13] and was granted.[14] The second, requesting payment of $95,260.08,[15] is pending.

## II. The Fund Creditors' Motion and Responses

The Fund Creditors filed their Motion for Disgorgement of Professional Fees (hereafter Motion) on May 21, 2019.[16] They argue that an adjustment is needed because, although both the Fund Creditors and the attorneys for the

---

[11] Doc. 338.

[12] *See* doc. 418, 2 n.2.

[13] Doc. 377.

[14] Doc. 397.

[15] Doc. 387.

[16] Doc. 402.

5

Debtors and the Committee are administrative expense creditors, those of the attorneys have been paid but the Fund Creditors have not. They request that the Professional Fees paid on an interim basis be disgorged and reallocated so the Fund Creditors and the attorneys receive a *pro rata* share.

The Debtors oppose the Motion.[17] They argue that the Fund Creditors fail to show that their claims satisfy the test for administrative priority of claims arising under collective bargaining agreements, that the Fund Creditors failed to object to the orders approving fee applications, and that the case law on which the Fund Creditors rely is inapplicable.

The Unsecured Creditors Committee also objects.[18] It argues that the Professional Fees which the Fund Creditors seek to disgorge are within the carve-out in the cash collateral orders and carve-outs are recognized as a means for allowing secured creditors to waive their liens and super-priority claims to allow the payments of certain administrative expenses, but not others. Further, according ot the Committee, if the Professional Fees were disgorged, they would flow back to Equity Bank, not to administrative creditors.

---

[17] Doc. 408.

[18] Doc. 412.

6

## III. Analysis

The Bankruptcy Code states a "basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate."[19] Classes of claims are defined in § 507. In Chapter 7 cases, the various classes of claims are ranked and within each rank, payment "shall be made pro rata."[20] A Chapter 11 plan must provide for the same treatment of each claim or interest within a particular class, unless the holder agrees to other treatment.[21] A bankruptcy court may not confirm a structured dismissal of a Chapter 11 case "that contains priority-violating distribution over the objection of an impaired creditor class."[22]

As stated above, in their Motion, the Fund Creditors contend that the principle of pro rata distribution is being violated.[23] As a remedy, they contend the Court should disgorge the Professional Fees and order that the Fund Creditors and attorneys receive pro rata shares of the available funds.

---

[19] *Czyzewski v. Jevic Holding Corp.*, __ U.S. __, 137 S. Ct. 973, 979 (2017) (hereafter *Jevic*).

[20] § 725(a)-(b).

[21] § 1123(a)(4).

[22] *Jevic*, 137 S.Ct. at 979.

[23] For purposes of this memorandum, the Court shall assume that the Fund Creditors' claims for administrative expenses are in the same class as the claims for Professional Fees would be if there were no carve-out.

Interim awards of attorney fees are authorized by § 331. "'Interim allowances are always subject to the court's re-examination and adjustment during the course of the case.'"[24] Hence, the parties objecting to the Motion do not challenge the Fund Creditors' fundamental position that a bankruptcy court may disgorge the interim awards of fees and expenses. The question is simply whether disgorgement is authorized in the circumstances of this case.

The primary authority relied by the Fund Creditors is *Specker*,[25] a decision of the Sixth Circuit Court of Appeals. The case was commenced under Chapter 11. The bankruptcy court authorized the debtor's employment of counsel, and a $10,000 retainer was paid. The United States Trustee's motion to convert the case to Chapter 7 was granted. Debtor's counsel's final fee application for $17,343.10 was approved. The Court allowed counsel to keep the retainer. Upon final liquidation, the estate's assets were insufficient to pay administrative expenses having the same priority as the attorney's fees, and disgorgement was ordered. Since the attorney's pro rata share of the liquidation pool was $973.41, the attorney was ordered to disgorge $9,026.59 of the $10,000 retainer. The attorney appealed the disgorgement. The district

---

[24] *Callister v. Ingersol- Rand Fin. Corp. (In re Callister)*, 673 F.2d 305, 307 (10th Cir. 1982) (quoting 2 *Collier on Bankruptcy* § 331.03 (15th ed. 1981)).

[25] *Specker Motor Sales v. Eisen*, 393 F.3d 659 (6th Cir. 2004).

8

court affirmed, and appeal was taken to the court of appeals. It also affirmed. The Sixth Circuit found that § 726(b) mandated pro rata distribution to administrative claimants of the same class. Citing a Tenth Circuit case,[26] it also held that interim compensation of attorneys, authorized by § 331, is "subject to re-examination and adjustment."[27] Retainers, "which are held in trust for the estate, and remain the property of the estate,"[28] are always subject to disgorgement.

*Specker* was broadly construed in *World Waste*,[29] a case also relied on by the Fund Creditors. That case was commenced under Chapter 11. The bank holding a security interest in substantially all of the debtors' assets entered into a cash collateral agreement permitting debtors to use cash collateral to fund expenses in accord with a formula and budget. A sale of all of the debtors' operating assets was approved, and, using the sale proceeds, debtors paid most, but not all, administrative expenses. The debtors remained in Chapter 11 but were admittedly administratively insolvent. The

---

[26] *In re Callister*, 673 F.2d at 305.

[27] *Specker Motor Sales*, 393 F.3d at 663.

[28] *Id.*

[29] *In re World Waste Services*, 345 B.R. 810 (Bankr. E.D. Mi. 2006). The Court notes that several courts have been critical of *Specker*. *E.g.*, *In re Headlee Mgmt. Corp.*, 519 B.R. 452 (Bankr. S.D.N.Y. 2014).

9

court-appointed special counsel, who had not been paid, moved for disgorgement of previously paid administrative expenses, arguing that under *Specker* all such expenses are to be paid equally under the Code. The court broadly construed *Specker* as not limited to disgorgement of retainers but holding "as a matter of bankruptcy law, if disgorgement is necessary in order to achieve the result of having all or some proper group of administrative creditors treated the same, then disgorgement is an appropriate remedy."[30] The court therefore concluded that disgorgement was "theoretically permitted,"[31] but declined to address how equality of treatment could be achieved, a matter requiring further exploration given the complexity of the case.

Debtors and the Unsecured Creditors Committee respond that *Specker* does not apply in this case because the cash collateral orders contain a carve-out that protects the Professional Fees from disgorgement. A carve-out has been defined as "the provision of the financing order in which the lender agrees to subordinate its liens to certain defined professional and United States trustee fees."[32] Stated differently, "a carve-out is essentially an

---

[30] *Id.* at 815,

[31] *Id.* at 816.

[32] 5 Collier *Bankruptcy Practice Guide,* ¶ 89.03 (Alan N. Resnick & Henry J. Sommer eds.-in-chief 2019).

10

agreement pursuant to which a secured creditor allows post-petition proceeds otherwise subject to its secured claim to be exclusively earmarked to pay professionals."[33] In other words, the secured creditor agrees to carve out funds to which it is entitled by virtue of its secured status for payment of professionals. Carve-outs are a response to the uncertainty of payment of administrative expenses inherent in Chapter 11 cases. As one court has explained:

> [W]here there are insufficient unencumbered assets with which to pay administrative expenses, professionals employed by the debtor or by creditors' committees may not ordinarily look to secured creditors' collateral for payment.
>
> Indeed, "[i]n every case there is the uncertainty that the estate will have sufficient property to pay administrative expenses in full." Those holding administrative claims may run the risk of non-payment or partial payment whenever there is an adequate protection shortfall under section 507(b), supper-priority borrowing under section 364, or conversion of the case and subordination of Chapter 11 administrative expenses under section 726(b) of the Bankruptcy Code. These risks are well known to experienced bankruptcy practitioners . . . . To deal with some of the above mentioned risks, professionals usually negotiate a carve-out to provide for the payment of their allowed fees. In other words, the effect of a carve-out is to allow affected professionals to look to the

---

[33] Judith Greenstone Miller, *Protecting Professional Fees from Disgorgement*, 25 Am. Bankr. Inst. J. 40, 79 (2006).

secured creditor's collateral where otherwise they would not be able to do so.[34]

The leading case holding that fees protected by a carve-out are not subject to disgorgement is *US Flow*.[35] In that case, US Flow and four related corporations filed for relief under Chapter 11. The court approved appointment of counsel for the debtors and the official unsecured creditors committee. It also entered an order allowing the use of cash collateral, subject to specific conditions, and granting the secured creditors replacement liens in substantially of the debtors' property. The cash collateral order also contained a $55,000 carve-out to benefit Chapter 11 court appointed professionals. "[I]t was expressly recognized that the $55,000 carve-out was superior to the Secured Creditors' interests in the collateral."[36] Less than a month after filing, the cases were converted to Chapter 7. There was no question that the bankruptcy estate was administratively insolvent. The United States Trustee requested the court to determine that the carve-out funds were property of the estate. The professionals requested the court to order that the carve-out funds be distributed to them. When resolving the

---

[34] *In re Molycorp, Inc.*, 562 B.R. 67, 76 (Bankr. D. Del. 2017) (footnotes omitted).

[35] *In re US Flow Corp.*, 332 B.R. 792 (Bankr. W.D. Mi. 2005).

[36] *Id.* at 794.

12

conflicting positions, the court first analyzed *Specter* and found that it "stands for the proposition that prepetition retainers, which are considered property of the estate, shall be disgorged to achieve *pro rata* distribution between similarly situated creditors, when a chapter 11 estate later proves to be administratively insolvent."[37] But the bankruptcy court found that *Specter* did not address the US Flow circumstance, "when a court-ordered carve-out is established or when a court-appointed professional is paid from a secured creditor's property rather than property of the estate."[38]

The court next examined the validity and enforceability of the carve-out. Because of the protections given to cash collateral by § 363, a carve-out requires the consent of the secured creditor to the transfer of an interest in its collateral to the debtor's attorney or other professional. The cash collateral order must establish that a carve-out was intended to be created and was in fact created. Further, the secured creditor's lien in the cash collateral that is transferred by the carve-out must be unassailable—there must be no challenge to the validity or priority of the creditor's lien. Because these conditions were present, the court upheld the validity of the carve-out. Unlike the retainer in *Specker*, which was property of the estate, the funds

---

[37] *Id.* at 795.

[38] *Id.*

carved out for payment of the professionals in *US Flow* were "not . . . property of the estate and are not recoverable by the estate for the benefit of all of its creditors,"[39] since the cash collateral lien was unassailable. Pursuant to prior court orders, the carve-out funds were designated to the exclusive benefit of the court appointed Chapter 11 professionals.

The cash collateral orders in this case defined the "carve-out costs" as (1) fees payable to the Clerk of this Court; (2) the Court approved professional fees of attorneys, accountants, and other professionals retained by the Debtors; (3) the statutory United States Trustee fees; and (4) Creditor Committee expenses.[40] The orders then provided that upon the occurrence of an event of default as defined by the orders, the liens and security interests of Equity Bank in its collateral (including its replacement liens) and its super-priority claim "shall be subject only to the right of payment" of the carve-out costs.[41] In other words, after default, Equity Bank agreed that its right to

---

[39] *Id*. at 798.

[40] *E.g.*, Doc. 52. The amount of such fees included in the carve-out are subject to limits in the approved budgets, but there is no assertion here that the interim compensation paid has exceeded the budgeted amount or any other limit imposed by the orders. Further, the carve-out applies to "the unpaid and outstanding reasonable fees and expenses incurred on or after the Petition Date and allowed under Local Bankruptcy Rule . . . as may subsequently be approved by a final order of the Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code." Doc. 52, p. 18. Therefore, the interim fees received by the professionals are included in the carve-out.

[41] *Id*. at 14.

14

collateral and to payment would be reduced by the amount of the Professional Fees. Rather than the Professional Fees being paid with unencumbered estate property on a pro rata basis with other similar administrative claims, Equity Bank agreed that after default the Professional Fees, as defined by the carve-out, are to be paid from property to which Equity Bank is otherwise entitled.

The cash collateral orders demonstrate that Equity Bank intended to create a carve-out for payment of the Professional Fees and that such a carve-out was in fact created. Further, Equity Bank's interest in its collateral, as defined by the cash collateral orders, is unassailable. There has been no objection to Equity Bank's liens. In the cash collateral orders the Debtors acknowledged the existence and perfection of Equity Bank's liens, and the Court approved the fixing and perfection of the replacement liens.

The existence of a valid carve-out precludes disgorgement of the Professional Fees. By virtue of Equity Bank's subordination of its interests to the cave-out expenses, the attorneys are being paid with Equity Bank's collateral rather than estate property. Since Equity Bank consented to this use of its property and the carve-out expenses are not being paid with estate property, the Court lacks authority to order disgorgement.

15

The Court rejects the Fund Creditors' argument that enforcing the carve-out is contrary to the Supreme Court's decision in *Jevic*.[42] In that case, the Supreme Court held that a bankruptcy court cannot approve "a structured dismissal that . . . provides for distributions that do not follow ordinary priority rules without the affected creditors consent."[43] Contrary to the Fund Creditors' argument, denying disgorgement in this case because of the carve-out does not violate the Code's established priority system. The carve-out funds are Equity Bank's collateral to which it is entitled under the Code's priority rules. If the carve-out funds were not distributed for the payment of carve-out fees, they would be distributed to Equity Bank, but Equity Bank has consented to the distribution to the professionals. The attorneys for Debtors and the Unsecured Creditors Committee are not being paid with estate funds, the distribution of which must comply with the Code's priority rules.

The Fund Creditors argue that they are situated similarly to counsel for the Debtors and the Unsecured Creditors Committee because the cash collateral order provided for payment on an ongoing basis of its claims, as well as the Professional Fees. While the cash collateral orders were operative,

---

[42] *Jevic*, 137 S. Ct. at 973.

[43] *Id.* at 983.

16

the payments were from the same source. The Fund Creditors, counsel for the Debtors and the Committee, and others providing services to the Debtors were paid with cash collateral and Equity Bank was granted a replacement lien and a super-priority claim to the extent of the diminution of the value of its collateral.  But a change occurred when Equity Bank gave notice of a default under the cash collateral orders. That notice triggered the carve-out under which the unpaid fees of the professionals were paid from funds carved out of the collateral securing Equity Bank's replacement lien and/or its super-priority claim. After the notice of default, the Fund Creditors and the Professionals were no longer paid from the same source of funds and are not similarly situated.

## IV.  Conclusion

For the forgoing reasons the Court denies the Fund Creditors' Motion for Disgorgement. The fees and expense of the Debtors' counsel and attorney fees and expenses incurred by the Unsecured Creditors Committee are carve-out costs as defined by the cash collateral orders. After Equity Bank gave notice of a default as defined by the cash collateral orders, the carve-out terms became operative, and the source of the funds for payment of the Professional Fees is the bank's collateral and/or reduction of its super-priority claim, not property of the estate subject to disgorgement.

17

## V.    Judgment

Judgment denying the Motion for Disgorgement is hereby granted. The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. The judgment based on this ruling stated above will become effective when it is entered on the docket for this case, as provided by Federal Rule of Bankruptcy Procedure 9021.

**It is so Ordered.**

**###**